IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **GERALD WAYNE SNOW, JR.** | ) | |
| | ) | |
| *Defendant/Petitioner*, | ) | |
| | ) | |
| **v.** | ) | **Case No.  CIV-12-301-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff/Respondent*. | ) | |

## OPINION AND ORDER

This matter has come before the Court for consideration of the Petitioner Gerald Wayne Snow, Jr.'s Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [Doc. No. 1].   The Court has considered Petitioner's motion as well as the Government's Response [Doc. No. 5] and Petitioner's reply [Doc. No. 6].

Petitioner seeks to vacate his sentence and conviction on the grounds that (1) this Court improperly applied a sophisticated means enhancement where his individual fraudulent actions did not further the overall scheme and (2) that his counsel was ineffective for not making this argument on appeal.

In August 2009, a federal grand jury charged Petitioner, his father Gerald Snow, Sr., and two other co-conspirators with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, and Criminal Forfeiture pursuant to 18 U.S.C. § 982, 21 U.S.C. § 853 and 28 U.S.C. § 2461.   The facts underlying the conspiracy, as found by the Tenth Circuit, are as follows:

> Gerald Wayne Snow, Jr. (Snow) was a fireman and owner of two residential construction companies, C & J Homes and Snow Homes. His father, Gerald Wayne Snow, Sr. (Gerald) was the president of Storybook Homes, also a residential construction company. From 2003 to 2005, Storybook Homes platted and dedicated three housing subdivisions in Wagoner County, Oklahoma. Snow and Gerald built homes within these subdivisions. Then, with the help of Gaile Cates and Ayo Olaniyan (both employees of mortgage brokerage businesses), Snow and Gerald recruited individuals to purchase

homes by offering to pay their down payments and closing costs and to give them cash back and/or pay off their outstanding debts after closing. To ensure the buyers would qualify for loans, Snow and Gerald (1) gave the buyers money to temporarily deposit into their bank accounts, artificially inflating their financial situation (the money was paid back after the lenders verified the funds), (2) prepared false loan applications overstating the buyers' income and assets, (3) provided at least one buyer a fictitious employment verification letter, and (4) set up sham second mortgages, giving lenders the false impression that their companies were financing a portion of the purchase price with subordinated funds. However, Snow and Gerald told the buyers they would not be required to make payments on the second mortgages.

In numerous instances, Snow and Gerald provided buyers with cashiers' checks to make the down payment and pay closing costs. Since the cashiers' checks indicated they were purchased by the buyers, the closing documents misrepresented the source of the money. Cates and Olaniyan also artificially inflated the prices of the homes on the loan application, allowing Snow and Gerald to obtain loan proceeds in an amount greater than the true purchase price. After closing, they would use part of the loan proceeds to pay cash back to the buyers and/or pay off the buyers' outstanding debts. These payments were not reported to the lender. They would also pay Olaniyan and Cates for their part in the fraudulent scheme.

Not surprisingly, many of the buyers defaulted, resulting in foreclosure of the home mortgages. As a consequence, the owners of the mortgages lost millions of dollars.

*United States v. Snow*, 468 Fed. Appx. 830, 832 (10th Cir. 2012).

Petitioner pled guilty pursuant to a written plea agreement in which he waived his post-conviction rights and his appellate rights with the exception of two specific issues: (1) the loss calculation and (2) the sophisticated means enhancement. The agreement also contains a waiver of his post-conviction rights except for ineffective assistance of counsel claims relating to the validity of the guilty plea or the waiver.

On appeal, Petitioner's appellate counsel argued that Petitioner's acts in defrauding the lending institutions were garden variety fraud present in all mortgage fraud cases and not

2

especially intricate or complex to warrant the sophisticated means enhancement.[1]   On February 9, 2012, the Tenth Circuit affirmed Petitioner's conviction and sentence.  *Snow*, *supra*.[2]

The Court is presented with both procedural and substantive reasons to deny Petitioner's motion.

To begin, the requested relied is barred by the waiver provisions of Petitioner's written plea agreement.  The Tenth Circuit follows a three-part test for evaluating whether a defendant has waived his post-conviction rights, asking "(1) whether the issue appealed or challenged falls within the scope of the text of the waiver; (2) whether the waiver was knowingly and voluntarily entered into; and (3) whether enforcing the waiver would result in a miscarriage of justice."  *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) (applying the standard for analyzing appellate waivers announced in *United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004) to waiver of collateral challenges).  In ascertaining whether the waiver was knowing and voluntary, the court "examine[s] whether the language of the plea agreement states that the defendant entered the agreement knowingly and voluntarily" and whether there was an "adequate Federal Rule of Criminal Procedure 11 colloquy."  *Hahn*, 359 F.3d at 1325.

The Tenth Circuit limits miscarriage of justice to four narrow situations: "[1] where

---

[1] Appellate counsel also raised the issue of loss calculation in the appeal.  However, since Petitioner does not challenge counsel's performance or the ultimate conclusion on that issue, the Court will not discuss the specific arguments advanced by Petitioner's appellate counsel or the Tenth Circuit's findings.

[2] Gerald Snow, Sr. also appealed his conviction and sentence, including the sophisticated means enhancement.  His case was decided prior to Petitioner's appeal.  See *United States v. Snow*, 663 F.3d 1156 (10th Cir. 2011).  In affirming the sophisticated means enhancement for Petitioner, the Tenth Circuit relied heavily on the Gerald Snow, Sr. opinion.  *Snow*, 468 Fed. Appx. at 841-42.

the district court relied on an impermissible factor such as race, [2] where ineffective assistance of counsel in connection with the negotiation of the waiver renders the waiver invalid, [3] where the sentence exceeds the statutory maximum, or [4] where the waiver is otherwise unlawful." *Id.* at 1327 (relying on *United States v. Elliott*, 264 F.3d 1171, 1173 (10th Cir. 2001) and *United States v. Cockerham*, 237 F.3d 1179, 1182 (10th Cir. 2001)). Moreover, this "list is exclusive: enforcement of an appellate waiver does not result in a miscarriage of justice unless enforcement would result in one of the four situations enumerated above." *United States v. Shockey*, 538 F.3d 1355, 1357 (10th Cir. 2008) (quotations omitted).

The waiver provisions in Petitioner's plea agreement satisfy the *Pinson/Hahn* three-part test. First, the waiver explicitly addresses the right "to collaterally attack the conviction and sentence pursuant to 28 U.S.C. §2255, except for claims based on the ineffective assistance of counsel which challenge the validity of the guilty plea or this waiver." Petitioner has not challenged his plea or the waiver; therefore, his claims clearly fall within the scope of the waiver.

In his reply, Petitioner cites *United States v. Ezell*, 2009 WL 4016457 (S.D. Ala. 2009)(unpublished) for the proposition that ineffective assistance claims are excluded from the appellate and post-conviction waiver. However, in addition to being non-binding authority, *Ezell* is factually distinguishable. The plea agreement in *Ezell* excluded from the waiver ineffective assistance claims generally, not the specific subset of ineffective assistance claims dealing with the plea or waiver at issue here.[3] Petitioner's plea agreement

---

[3] The district court refused to enforce the waiver, determining that the language of the plea agreement was ambiguous, and therefore, Ezell could not have known what he was waiving:

In Ezell's Plea Agreement, there is a tension between Paragraphs 21 and 22(c). The former provision states that, subject to the exceptions in Paragraph 22, Ezell

is drafted in a way that avoids the ambiguity found in the *Ezell* plea agreement.

Second, the waiver provisions in the written plea agreement are unambiguous and appear beneath the boldfaced, capitalized heading "Waiver of Appellate and Post-Conviction Rights."  Petitioner initialed each individual page of the plea agreement, and he separately signed the waiver provision section of the plea agreement following a paragraph verifying that defense counsel discussed the appellate and post-conviction rights with him, that Petitioner understood those rights, and that he willingly relinquished them.  Petitioner and his counsel signed a second verification on the last page of the plea agreement under the heading "Acknowledgments," confirming that Petitioner's decision to plea was an informed one, made after he had an opportunity to discuss his options and the consequences with his attorney.

---

waives his right to challenge a sentence, or the manner in which it was determined, via § 2255 motion. However, the latter provision contains an express carve-out preserving Ezell's right to bring "[a] claim of ineffective assistance of counsel" in a § 2255 proceeding. *Perhaps the Government, as drafter of the Plea Agreement, intended the Paragraph 22(c) exception to encompass only a subset of the universe of potential ineffective assistance claims (e.g., claims of ineffective assistance in connection with the negotiation or entry of a guilty plea or plea agreement), but not to embrace claims of ineffective assistance pertaining to sentencing.* But that's not what the Plea Agreement says. Indeed, the Plea Agreement prepared by the Government and executed by Ezell does not on its face impose any limitations on the kinds of ineffective assistance claims that are permissible; rather, it would appear to preserve the entire spectrum of ineffective assistance claims for appellate review or collateral attack. . . . Because of this ambiguity, Ezell could not reasonably have known that the Government's intent in drafting Paragraph 22(c) was to authorize some kinds of ineffective assistance claims but not others (assuming that is in fact what the Government intended). If Ezell could not reasonably have known that he was waiving ineffective assistance of counsel claims relating to sentencing, despite Paragraph 22(c)'s broad language to the contrary, then his purported waiver of those claims cannot possibly be knowing and voluntary, as required for the waiver to be enforceable.

*Id*. at 3(emphasis added).

Furthermore, Petitioner was represented by counsel during the change of plea hearing, during which the charges were read, the statutory punishments were stated, the possible sentences under the Guidelines were discussed, and the terms of the plea agreement were summarized. Petitioner confirmed that he heard and understood each of these. The Court specifically discussed the appellate and post-conviction waiver with Petitioner, who confirmed that counsel had discussed each provision with him and that he did not have any questions about the terms of the plea agreement. The Court specifically asked Petitioner if his "plea of guilty was made voluntarily and completely of [his] own free choice," to which Petitioner responded affirmatively.

Finally, enforcing a plea waiver results in a miscarriage of justice in only four scenarios, none of which are present here. *See generally*, *Shockey*, 528 F.3d at 1357. First, the Court did not rely on an impermissible factor such as race. Second, Petitioner has not alleged ineffective assistance of counsel in negotiating the waiver, which would render the waiver invalid. Third, Petitioner's sentence does not exceed the statutory maximum. Fourth, the waiver is not otherwise unlawful as the claimed error does not seriously "affect[] the fairness, integrity or public reputation of judicial proceedings." *Hahn*, 359 F.3d at 1327 (brackets in original).

Notwithstanding the post-conviction waiver, a petitioner is typically procedurally barred from asserting in a petition for collateral relief, any issue that should have been raised on direct appeal. *United States v. Cook*, 997 F.2d 1312, 1320 (10th Cir. 1993). Petitioner cannot overcome the procedural bar "unless he can show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or can show that a fundamental miscarriage of justice will occur if his claim is not addressed." *Id.* Ineffective assistance of counsel constitutes the cause necessary to overcome a procedural bar. *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) (citing *Murray v.*

*Carrier*, 477 U.S. 478, 488 (1986)).

However, Petitioner cannot establish that he received ineffective assistance from his appellate counsel. To prevail on such a claim, Petitioner must first "show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Then Petitioner must establish "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* This is a conjunctive test requiring Petitioner to prove *both* elements before he is entitled to relief.

While failure to raise an issue may be the basis for a valid ineffective assistance claim, "counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Welch v. Workman*, 639 F.3d 980, 1012-13 (10th Cir. 2011) (parentheses in original). Indeed, the "Sixth Amendment does not require an attorney to raise every nonfrivolous argument on appeal." *Challoner*, 583 F.3d at 749 (quoting *United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995) (abrogated on other grounds)). The decision not to raise every viable issue is sound strategy.

> The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Every weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court. For these reasons, a lawyer who throws in every arguable point - "just in case" - is likely to serve [his] client less effectively than one who concentrates solely on the strong arguments.

*LaFevers v. Gibson*, 182 F.3d 705, 722 (10th Cir. 1999) (quoting *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

The success of Petitioner's ineffective assistance claim for failure to raise an issue turns on whether the omitted issue has merit. "When considering a claim of ineffective

assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue.  If the omitted issue is without merit, counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel." *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999) (quotations omitted).   Typically, this analysis is conducted with the other issues counsel did pursue in mind.

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

*Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).  Petitioner's counsel did raise the sophisticated means enhancement on appeal; he just made a different argument than the one Petitioner currently proposes.  Now, Petitioner argues that counsel should have made an alternate argument.

In any event, Petitioner's proposed argument would have been unsuccessful on appeal. Petitioner asserts that even though the overall scheme was sophisticated, his own transactions did nothing to further the operation as a whole and therefore, the sophisticated means enhancement was improperly applied.  Petitioner does not cite any authority to support his argument.  While the Tenth Circuit has not addressed this specific issue, all the Circuits that have hold that a defendant whose individual acts are unsophisticated may still be assessed the sophisticated means enhancement if the acts of his co-conspirators involving such conduct were foreseeable to him.[4]  See *United States v. Jagunna*, 426 Fed. Appx. 94, 97-98

---

[4] Petitioner appears to be aware, at least generally, of this persuasive authority. [Doc. No. 1 at 4]. ("Every circuit that has considered the issue has concluded that an enhancement for sophisticated [sic] is not designed for individual conduct characteristic [sic], but rather the conduct of the overall operation.").

(3d Cir. 2011) (unpublished) (the language of Guideline Section 2B1.1(b)(9)(C) is directed to the offense, and not to the defendant's individual conduct); *United States v. Cosgrove*, 637 F.3d 646, 666 (6th Cir. 2011) ("sophisticated-means enhancement could be applied to [a defendant] even if his role in the conspiracy did not involve the use of sophisticated means so long as the use of such means was reasonably foreseeable to him."); *United States v. Bishop-Oyedepo*, 2012 WL 1676687 *2 (7th Cir. 2012) (unpublished) (same); *United States v. Green*, 648 F.3d 569, 576-77 (7th Cir. 2011) (same); *United States v. Jenkins-Watts*, 574 F.3d 950, 965 (8th Cir. 2009) (same); *United States v. Carranza*, 362 Fed. Appx. 973, 977 (11th Cir. 2010) (unpublished) ("plain language of § 2B1.1(b)(9)(C) provides that the enhancement applies if '*the offense* involved sophisticated means.' U.S.S.G. § 2B1.1(b)(9)(C) (emphasis added). Because the relevant offense is the conspiracy, the district court was permitted to consider the reasonably foreseeable actions of [defendant's] co-conspirators when determining whether the enhancement applies.").

Accordingly, a sentencing court is to consider whether "the *offense* otherwise involved sophisticated means" not whether the particular defendant used sophisticated means in his individual acts. U.S.S.G. § 2B1.1(b)(10)(C)[5] (emphasis supplied). Further, because of the relevant conduct provision, the defendant is responsible for the reasonably foreseeable conduct of others involved in the jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1)(B).

Here, Petitioner admits that the overall scheme was sophisticated. [Doc. No. 1 at 2]. Therefore, the only remaining inquiry is whether the sophisticated conduct was foreseeable to him. He alleges that this Court did not make a particular finding that it was foreseeable.

---

[5] At the time Petitioner was sentenced, the sophisticated means enhancement was found at U.S.S.G. § 2B1.1(b)(9)(C). (*PSR* at ¶ 122). On November 1, 2011, the provision was redesignated as U.S.S.G. § 2B1.1(b)(10)(C) because of the addition of a new subsection; however, the substance of the provision remains unchanged.

To the contrary, both this Court and the Tenth Circuit discussed Petitioner's knowledge of the overall scheme in deciding to hold him accountable for the loss from the Taylor home. This Court found that:

> [d]ue to the commingling of funds from Jerry Snow and Gerald Snow, Sr.'s companies during this extensive mortgage fraud scheme, it was reasonably foreseeable to Jerry Snow that Gerald Snow, Sr. would employ the same fraudulent means in selling the Taylors' home that the defendants employed continuously throughout this mortgage fraud scheme.

(*Sent. Tr.* at 113-114); *Snow*, 468 Fed. Appx. at 834.   The Tenth Circuit made a similar finding regarding the Taylor transaction:

> Given Gerald's participation with Snow in the fraudulent scheme, it should have come as no surprise to Snow, i.e., it should have been reasonably foreseeable to Snow, that when he involved Gerald, fraud ensued.  Given his and Gerald's history together, he had no reason to assume the tiger (Gerald) would change his stripes.

*Snow*, 468 Fed. Appx. at 837. Petitioner's knowledge about the sophisticated means of the scheme as a whole can be inferred from these findings about the foreseeability of the fraud in the Taylor transaction.

In further discussing the foreseeability issue, the Tenth Circuit noted facts which suggest that a sophisticated means enhancement would have been warranted even considering only those transactions which involved Petitioner.

> [T]here were numerous transactions involved in the fraudulent scheme which only involved Snow, not Gerald.  But the *scheme was always the same* - the construction of a home, inducing buyers to purchase the home by paying their closing costs and down payments, falsifying loan documents with the help of Cates and/or Olaniyan, and obtaining loan proceeds in excess of the purchase price.  Thus, *the mere fact a particular transaction involved either Snow or Gerald is irrelevant to the foreseeability of the ongoing fraud.*

*Id.* (emphasis supplied).

In his reply, Petitioner cites *United States v. Melton*, 131 F.3d 1400 (10th Cir. 1997) for the proposition that mere foreseeability is insufficient to bring another's conduct within the scope of a co-conspirator's jointly undertaken criminal activity.  However, *Melton*

involves a counterfeiting operation where the scheme changed following the arrest of two co-conspirators. *Id.* at 1404-05. The Tenth Circuit determined those co-conspirators "should not be held accountable when coconspirators substantially alter the agreed upon plan without [their] knowledge or acquiescence." *Id.* at 1405. No such alteration occurred in this conspiracy. Throughout the conspiracy, the same tactics were used.

It appears Petitioner may be confusing the sophisticated means enhancement with the leader/organizer enhancement. Petitioner mentions that he never spoke with the other co-defendants, that he received all his instructions from his father, that he did not further the scheme outside his own transactions and that he did not receive profits from the operation as a whole. [Doc. No. 1 at 3][6]. Notably, Gerald Snow, Sr. received the leader/organizer enhancement, while Defendant did not. (*PSR* at ¶ 124); *Snow*, 663 F.3d at 1162-63. The leader/organizer enhancement and the sophisticated means enhancements are separate and distinct Guideline provisions.

Appellate counsel was not ineffective where he raised the sophisticated means enhancement on appeal but did not make the specific contention Petitioner is now proposing, particularly when every Circuit to have addressed the issue has rejected Petitioner's proffered argument.

Petitioner's motion to vacate is hereby **DENIED**. Further, the files and records of the case and the authorities cited conclusively show that Defendant is entitled to no relief and that an evidentiary hearing would serve no purpose. See *United States v. Barboa*, 777 F.2d 1420, 1422, n. 2 (10th Cir. 1985).

---

[6] Factors to be considered in assessing the leader/organizer enhancement are "the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, Application Note 4.

DATED this 4th day of April, 2013.

James H. Payne
United States District Judge
Eastern District of Oklahoma